IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ELIZABETH ANN BERTSCH,<br><br>                    Plaintiff,<br><br>    v.<br><br>OVERSTOCK.COM,<br><br>                    Defendant. | **FINDINGS OF FACT &<br>CONCLUSIONS OF LAW**<br><br><br>Case No. 2:10-CV-00037<br><br>Judge Robert J. Shelby |

Elizabeth A. Bertsch[1] brought suit against her former employer, Overstock.com, asserting retaliation in violation of Title VII of the Civil Rights Act.  By stipulation, the parties tried this case in a three-day bench trial.  The court now enters the following findings of fact and conclusion of law.

## FINDINGS OF FACT

Overstock, an Internet retailer, hired Ms. Bertsch as an at-will, entry-level customer service representative in February 2001.  During the course of her Overstock employment, Ms. Bertsch advanced to the positions of creative lead and inventory control lead.  In 2002, Ms. Bertsch transferred to the Books, Movies, and Video Department (Media Department).  Ms. Bertsch worked with the Media Department until her termination in May 2004.

---

[1] Several names changed in the eight years between Ms. Bertsch's termination from Overstock and the bench trial. Ms. Bertsch once used the name Elizabeth Sigler.  During the events that gave rise to this suit, Karrie Howard used the name Karrie Sleater, and Erika Barney went by Erika Leifson.  For the sake of clarity, the court refers to these individuals by the last name used at the time of trial.

### A.      Overview of the Media Department

The Media Department was composed of a small group of buyers, administrative support, and supervisors.  The buyers included Tom Jourdane, Mark Allgood, Andy Fletcher, and Dustin Latimer.  Ms. Bertsch provided administrative support to the buyers.  Mike Hoy and Jenny Clark later joined the Media Department as administrative support.[2]  Mr. Hoy administered the website and inventory.  Ms. Clark was hired to assist Ms. Bertsch at the warehouse.  Shawn Schwegman was the supervisor at the time Mr. Bertsch transferred into the Media Department.  In the spring of 2003, Brian Popelka replaced Mr. Schwegman.  Mr. Popelka reported to Stormy Simon.

The physical layout of the Media Department changed over time.  During the relevant time period, the members of the Media Department worked in a cubicle environment.  These cubicles were arranged in close proximity to one another.  The cubicle walls were approximately six feet high.  But the various members of the Media Department could observe and hear their coworkers working within each individual cubicle space.

At different points in time, Ms. Simon and Mr. Popelka worked in offices separate from the Media Department cubicles.[3]  Ms. Simon and Mr. Popelka, however, both observed Ms. Bertsch's behavior in the workplace and her interactions with coworkers.  As discussed below, Ms. Bertsch's attitude—along with its impact on the effectiveness of the Media Department— became an issue of ongoing concern to Ms. Simon and Mr. Popelka.

---

[2] Although none of the witnesses provided an exact date, Mr. Hoy and Ms. Clark appear to have been hired in the spring of 2004, after Overstock management became aware of issues arising out of Ms. Bertsch's workload.

[3] At one point in time, Ms. Simon worked on a different floor.  Although Ms. Simon did not interact with the Media Department on a daily basis, the court finds that Ms. Simon credibly testified that she observed and interacted with Ms. Bertsch in the workplace.

B.      **Ms. Bertsch's Job Responsibilities and Annual Reviews**

Ms. Bertsch's job responsibilities and her role within the Media Department are central to this case.  Ms. Bertsch described her duties as providing support for Mr. Jourdane, Mr. Fletcher, Mr. Latimer, and Mr. Allgood.  Ms. Bertsch was responsible for facilitating purchase orders and placing inventory on the company's website.  Throughout trial, it was evident to the court that Ms. Bertsch's position required her to work closely and cooperatively with the buyers.

As part of her regular job responsibilities, Ms. Bertsch worked part-time at Overstock's warehouse.  She visited the warehouse to write copy and image products that were absent from the company's database.  This occurred approximately one to two times a month throughout most of the year.  But during the months leading up to Overstock's holiday season, Ms. Bertsch would visit the warehouse one to two times per week.  Ms. Bertsch had an office space reserved at the warehouse.  She testified that she did not enjoy working at the location because of the noise and lack of temperature control.

Ms. Bertsch received two formal reviews in the Media Department.  In her 2003 Annual Review, Ms. Bertsch's supervisor informed her that "she needs to work on getting along with her fellow employees [and that] she needs to continue to develop her relationship skills."[4]  In the employee comments section of the review form, Ms. Bertsch wrote "weak points—my attitude – but I feel that it has improved in the last month."[5]  At trial, Ms. Bertsch acknowledged that she had been informed of concerns about her attitude but testified that she did not believe that her supervisor's opinion was true.[6]

---

[4] Trial Ex. 1.

[5] *Id.*

[6] Trial Tr. 324:5-326:12.

In her 2004 Annual Review, which occurred on January 19, 2004, Mr. Popelka advised Ms. Bertsch that she "needs to work on the team dynamic."[7] Mr. Popelka rated Ms. Bertsch's performance as "Meets Expectations" in the areas of Work Quantity, Interpersonal Skills, and Adaptability/Flexibility.[8] In the employee comments section, Ms. Bertsch wrote: "I agree with everything in this review."[9] Ms. Bertsch indicated in a contemporaneous document that, while she had made "great improvement," she would "continue to work on [her] interpersonal and communication skills."[10] During trial, Ms. Bertsch testified that she never informed Mr. Popelka that she disagreed with his assessment that she needed to work on the team dynamic.[11]

The parties contest the weight that should be given to the ratings Ms. Bertsch received during the 2004 Annual Review. Ms. Bertsch correctly points out that Mr. Popelka rated her performance as "Exceeds Expectations" in the areas of Job Knowledge, Communication Skills, and Dependability, and "Outstanding" in the areas of Work Quality.[12] At trial, however, Mr. Popelka credibly testified that "Meets Expectations," which was the performance rating he assigned in the areas of Work Quantity, Interpersonal Skills and Adaptability/Flexibility was "actually a fairly low mark," which he intended to reflect Ms. Bertsch's failure to work well with her coworkers.[13] Mr. Popelka also testified that he could not recall giving a lower mark than "Meets Expectations" to Ms. Bertsch or any other employee.

_____

[7] Trial Ex. 2.

[8] *Id.*

[9] *Id.*

[10] Trial Ex. 3.

[11] Trial Tr. 325:15-327:18.

[12] Tr. Ex. 2. Ms. Bertsch appears to have rated her performance slightly differently than Mr. Popelka. *See* Tr. Ex. 3. Ms. Bertsch testified that she felt positive after her 2004 Annual Review. Trial Tr. 248:3-7. Later that month, Ms. Bertsch received a raise, and her title changed from Inventory Control Lead to BMV Coordinator. Trial Ex. 20.

[13] Trial Tr. 406:4-407:21.

**C.      Mr. Latimer's Inappropriate Behavior**

By all accounts, Mr. Latimer, the Media Department's video buyer, engaged in several instances of shameful and inappropriate behavior while an employee of Overstock.  Erika Leifson, a former coworker and friend of Ms. Bertsch, complained to Mr. Schwegman and Mr. Popelka that Mr. Latimer was watching uncensored videos with naked men and women at his workstation.  At another point in time, Mr. Latimer hung a picture of a seminude woman in his cubicle.  After receiving multiple complaints, Mr. Latimer's supervisors instructed Mr. Latimer to stop viewing uncensored videos at work and ordered him to remove the offensive picture from his cubicle.

Mr. Latimer also appears to have made several unsavory comments.  Ms. Barney testified that Mr. Latimer "used the 'F' word quite frequently, and I did hear him say the 'C' word on occasion."[14]  After being told to remove the offensive picture from his cubicle, Mr. Latimer reportedly said: "[T]his never would have happened if we didn't have any women working in our department."[15]  When confronted with one of Ms. Bertsch's work-related mistakes, Mr. Latimer responded: "[T]his is the kind of work to expect from uneducated women."[16]  Mr. Latimer once commented: "[T]he department would run better if there weren't any women working here."[17]  And upon learning about a coworker's relationship with his ex-wife, Mr. Latimer stated: "Well, that's how all women should be, pay and put out."[18]

---

[14] Trial Tr. 192:11-12.

[15] *Id.* at 252:6-7.

[16] *Id.* at 252:21-22.

[17] *Id.* at 252:24-25.

[18] *Id.* at 253:9-18.

Ms. Bertsch testified that she complained to Mr. Popelka about Mr. Latimer watching uncensored videos, after which Mr. Popelka gave Mr. Latimer a portable DVD player.  Ms. Bertsch also complained to Mr. Schwegman about the offensive cubicle picture mentioned above.[19]  At trial, Ms. Bertsch indicated that she had made these complaints at least three to four months prior to the vendor email incident discussed below.  At least some of Ms. Bertsch's complaints must have occurred prior to August 2003, when Ms. Barney was affiliated with the Media Department.

Ms. Bertsch also briefly spoke with Mr. Popelka in the hallway at work about Mr. Latimer's behavior towards her prior to her February 2004 meeting with Human Resources.[20] The subject matter of the conversations with Mr. Popelka, other than general complaints about Mr. Latimer's relationship with Ms. Bertsch, is less than clear.  Notes from a Human Resources investigation conducted months later suggest that Ms. Bertsch may have discussed that Mr. Latimer treated women poorly and made some offensive comments.[21]  Mr. Popelka recalled a single hallway conversation with Ms. Bertsch, but he could not recall the subject matter.  While the record does not contain a full picture of the exact timing or specific substance of Ms. Bertsch's complaints prior to February 2004, the court finds that Mr. Popelka was at least aware of some conflict between Ms. Bertsch and Mr. Latimer in mid- to late 2003.[22]

---

[19] *Id.* at 347:21-24.

[20] Ms. Bertsch also testified that she first approached Overstock's Human Resource Department in February 2004. She testified that she heard a rumor of an individual being terminated for complaining of sexual harassment, and that she was afraid of losing her job.  *Id.* at 258:12-17.

[21] *See* Trial Ex. 6, at BER0268.

[22] At trial, Ms. Bertsch admitted that she had not articulated her complaints in detail prior to February 2004.  Trial Tr. 385:23-386:16.  Ms. Bertsch invites the court to find that Mr. Popelka admitted that Ms. Bertsch told him about Mr. Latimer's "disparaging and demeaning comments to and about women" during a UALD investigation.  The court declines to adopt or accept as true the factual findings of the UALD investigation, especially here, where Mr. Popelka could not recall making this admission and there is no corroborating testimony.  The court also notes that Ms. Simon credibly denied making statements that were incorporated into the UALD order.  The court will limit its

The record amply reflects that Mr. Latimer made Ms. Bertsch feel unwanted and unequal in the workplace after she joined the Media Department.  And it is equally apparent that neither Mr. Latimer nor Ms. Bertsch enjoyed the other's company.  Unfortunately, the symbiotic nature of their job responsibilities and the physical layout of the workspace only served to amplify the tension and animosity, which boiled over in February 2004.

**D.      Vendor Email Incident**

On February 17, 2004, Eric Johnson, an important vendor, requested a purchase order number from Mr. Latimer.  Mr. Latimer, in turn, sent an email requesting the number from Ms. Bertsch, who responded that the purchase order would be sent when it had been completed. Moments later, Mr. Latimer responded: "That's great, however, will you email Eric the po number, since you know the po number well in advance of the po actually being completed? That way, Eric can start getting the order prepared on his side."[23]  On the morning of the following day, Mr. Latimer sent another email, in which he wrote: "Hmm.  No response.  I guess we will just have to wait until [Ms. Bertsch] sees fit to send it.  I'll try to hurry it along Eric."[24] This email exchange was forwarded to the vendor, Ms. Bertsch, Mr. Popelka, and Ms. Simon.

The email exchange touched off a firestorm.  Ms. Berstch, upset and humiliated by Mr. Latimer's inclusion of the vendor on the email, sent a response to Mr. Latimer, Mr. Popelka, and Ms. Simon within fifteen minutes.  Ms. Bertsch indicated that (a) she had assumed most of a former coworker's responsibilities, (b) Mr. Latimer should give vendors a realistic estimate of when to expect purchase orders, (c) she did not know the purchase order number in advance of

---

consideration to the documents and materials received at trial, those facts stipulated by the parties, and the live testimony that the court had the benefit of observing in person.

[23] Trial Ex. 4, at BER0218.

[24] *Id.*

the order itself, (d) she attempted to divide her time equally between the buyers and her own responsibilities, and (e) she found Mr. Latimer's response offensive.[25] Approximately one hour later, Mr. Latimer sent an email to Ms. Bertsch, Mr. Popelka, and Ms. Simon clarifying his concerns about the purchase order, explaining the reasons for including the vendor in his response, expressing his intent to assist Ms. Bertsch, and apologizing for causing offense.[26]

Mr. Popelka and Ms. Simon received the vendor email exchange. Ms. Simon was concerned about the incident for several reasons. First, Ms. Simon had been cultivating a business relationship with the vendor in an attempt to expand into the video market. Second, Ms. Simon had a personal relationship with Mr. Johnson, who was "pushing the envelope" with his employer on Overstock's behalf.[27] Third, a purchase order number could be prepared prior to the completion of the order, which suggested that Ms. Bertsch failed to promptly issue the number. Fourth and finally, Ms. Simon believed that Ms. Bertsch's improper prioritization and poor teamwork had threatened a significant business opportunity with an important vendor.[28]

### E.    Investigation

The vendor email incident eventually led to corrective action for both Ms. Bertsch and Mr. Latimer. At trial, however, the parties disputed whether Overstock's actions were triggered by the vendor email incident, or Ms. Bertsch's complaint of harassment or sexual discrimination.

Ms. Bertsch testified that she visited Mr. Popelka's office on February 18, 2004, the same day of the vendor email incident. Ms. Bertsch testified that she informed Mr. Popelka and Ms. Simon that she had "some concerns of harassment or sexual discrimination, something along

---

[25] *Id.* at BER0217.

[26] *Id.*

[27] Trial Tr. 448:24-449:7.

[28] *Id.* at 449:8-19, 451:25-452:8.

those line" and asked for guidance.[29]  She testified that her managers referred her to the Human Resource Department.  Ms. Bertsch's counsel also cited correspondence sent in response to Ms. Bertsch's Charge of Discrimination.

In contrast, Overstock contends that following the vendor email exchange management instructed Karrie Howard, Overstock's Director of Human Resource Department, to investigate the vendor email incident, identify the source of the tension between Ms. Bertsch and Mr. Latimer, and initiate corrective action against Ms. Bertsch and Mr. Latimer.  After consideration of the testimony and evidence, the court finds Overstock's interpretation to be more accurate, at least in part because Ms. Howard provided credible corroborative testimony that her investigation into the vendor email incident began on February 18, 2004, after management brought it to her attention and asked her to investigate.[30]

After being contacted by management, Ms. Howard began her investigation by focusing on the contentious relationships within the Media Department.  As part of this investigation, Ms. Howard interviewed Ms. Bertsch, Mr. Latimer, Ms. Popelka, and Mr. Allgood.  Lacking an independent recollection of the interviews that occurred years earlier, Ms. Howard relied heavily on her notes at trial.

Ms. Howard met with Ms. Bertsch on February 20, 2004.  During the course of the interview, Ms. Bertsch raised several concerns relating to Mr. Latimer's behavior: (a) he insulted her in front of others; (b) he talked about her behind her back; (c) he referred to women as possessions; (d) he never said a kind word to her; (e) he made her feel like a servant, rather than a coworker; (f) he failed to look at her while speaking to her; (g) he displayed an explicit picture

---

[29] *Id.* at 257:22-258:1.

[30] Throughout trial, Ms. Howard provided credible testimony that should be entitled to particular weight.  Ms. Howard, who no longer works at Overstock, lacked any apparent bias or incentive to mislead the court.

in his work cubicle; (h) he stated that this picture would not have been removed "if we didn't have women on our team;" and (i) he stated "that's the way it should be" in response to another coworker's comments about engaging in a physical relationship with an ex-wife.[31]  Ms. Bertsch also reported that Mr. Latimer wanted to be the category manager for pornographic material, and that he had been "a jerk" to another female coworker.  Ms. Bertsch indicated that she did not want to work with Mr. Latimer, and that Mr. Latimer didn't seem to want to change or improve his behavior.  At trial, Ms. Bertsch testified that Ms. Howard's notes reflected every complaint that she shared with Ms. Howard.

Ms. Howard also interviewed Mr. Latimer, who "expressed frustration and dissatisfaction about working with Ms. Bertsch."[32]  Mr. Latimer reported (a) Ms. Bertsch went out of her way "to make him look like an ass in front of [a] vendor"; (b) she "lashes out" and "targets particular people"; (c) she failed to complete his work in a timely matter; (d) she was condescending towards Mr. Latimer; and (e) Ms. Bertsch and Mr. Latimer would go for weeks without talking.  Mr. Latimer agreed that it was a "hostile environment [but] for different reasons."[33]

Ms. Howard also interviewed Mr. Allgood and Mr. Popelka.  According to her interview notes, Mr. Allgood raised concerns about his fear of working with Ms. Bertsch "on the wrong day" and her negative attitude.[34]  As discussed above, the notes from Ms. Howard's interview with Mr. Popelka briefly reference two hallway conversations in which Ms. Bertsch may have expressed annoyance with Mr. Latimer and raised concerns that he treated women poorly.[35]  It

---

[31] Trial Ex. 5.

[32] Trial Tr. 99:9-11.

[33] Trial Ex. 6, at BER0214.

[34] *Id.* at BER0265.

[35] *Id.* at BER0268.

also appears that Mr. Popelka learned that Ms. Bertsch was "sensitive about some things" that Mr. Latimer had said.[36]  These informal conversations occurred three to four months earlier.[37]

Based on her investigation, Ms. Howard "determined that both Mr. Latimer and Ms. Bertsch needed to make improvement in their workplace behavior."[38]  Ms. Howard believed that both individuals were contributing to an uncomfortable and contentious work environment.  At the time of her investigation, Ms. Howard did not believe that Ms. Bertsch's statements about Mr. Latimer amounted to a complaint about sexual harassment.[39]

Ms. Howard's general practice at the time was to conduct an investigation, summarize the issues presented during the investigation, and meet with the manager of the employee at issue to offer her suggestion for an appropriate course of action.  Ms. Howard would then often work with the manager to put together and draft a written warning.[40]  In this particular investigation, Ms. Howard met with Mr. Popelka to summarize her findings and recommend written discipline.  Mr. Popelka also participated in the corrective action meetings with each employee.  Although Ms. Howard could not recall the specifics of the corrective action meeting with Mr. Latimer and Mr. Popelka, she testified: "[I]t makes logical sense that I would have brought up the specific examples of what was brought to our attention so that he wouldn't repeat them."[41]

At the same time, however, neither Mr. Popelka nor Ms. Simon assisted with the minutiae of the investigation or attended Ms. Howard's private interviews with either Ms. Bertsch or Mr.

---

[36] *Id.* at BER0268.

[37] *See supra* Findings of Fact, Part C.

[38] Trial Tr. 99:25-100:4.

[39] *Id.* at 97:15-98:3.

[40] A verbal warning was not a necessary prerequisite to a written warning.  The decision to issue a verbal or written warning depended on the severity of the incident.  And verbal warnings were not always documented.

[41] Trial Tr. 87:13-21.

Latimer.  And Ms. Howard did not share the details of Ms. Bertsch's interview with Ms. Simon or Mr. Popelka.  The court finds that Ms. Simon credibly testified that she did not learn of Ms. Bertsch's complaints until after her termination.[42]

### F.    Warehouse "Threat"

Ms. Bertsch met with Mr. Popelka on February 25, 2004.  Mr. Popelka described it as a cooperative meeting, in which he discussed the possibility of relocating Ms. Bertsch to her warehouse office in order to physically separate her from the team so that "she could focus better and be more productive."[43]  Mr. Popelka testified that he did not discuss terminating Ms. Bertsch at that time.  In contrast, Ms. Bertsch testified that she was given an ultimatum to transfer to the warehouse or take a two-week severance.  Ms. Bertsch could not recall specifically who gave the ultimatum.[44]  After careful consideration, the court concludes that Mr. Popelka credibly testified that he discussed the possibility of relocation but did not threaten Ms. Bertsch with termination.[45] Mr. Popelka nevertheless understood that Ms. Bertsch would view a full-time relocation to the warehouse as a punishment.

The next morning, Ms. Bertsch sent an email apology to Mr. Popelka and Ms. Simon. Ms. Bertsch acknowledged that she was part of the problem, requested an opportunity to prove

---

[42] Mr. Popelka was aware of the tension between Ms. Bertsch and Mr. Latimer.  He was also aware of at least a few instances of Mr. Latimer's inappropriate conduct, in part because of Ms. Bertsch's prior complaints and his participation in the corrective action meeting with Mr. Latimer.  At the same time, he was unaware of the specific details of Ms. Bertsch's interview with Ms. Howard.

[43] Trial Tr. 412:3-24.

[44] At some point in time, Ms. Simon, believing that Ms. Bertsch did not like anyone, spoke with Ms. Bertsch about working full-time from her warehouse office in order to alleviate the contention between Ms. Bertsch and her coworkers.  Similar to Mr. Popelka, she did not threaten Ms. Bertsch with termination or suggest that she resign.

[45] At trial, Ms. Bertsch argued that a draft severance agreement demonstrates that Mr. Popelka threatened her with termination.  The court disagrees.  First, there is credible testimony that termination was neither considered nor raised at that time.  Second, Ms. Bertsch testified that she was not presented with a severance agreement.  Trial Tr. 280:18-21.  Third, Ms. Howard testified that it was unlikely that Ms. Bertsch would have been given a choice between termination and relocation to the warehouse.  *Id.* at 81:10-20.

that she could change, and stated that she could improve her "attitude and become more 'user friendly' to all of [her] colleagues."[46] Ms. Bertsch indicated that she did not believe her "talents and abilities will be used effectively at the warehouse" and asked her supervisors to reconsider their decision.  Her email makes no reference of any "decision," nor does it reference any threat of termination.

Ms. Bertsch sent similar emails to coworkers in the Media Department.  In an email to Mr. Latimer, Ms. Bertsch referenced the problems in their work relationship and wrote, "I never intended to make you feel I was unapproachable or that your projects were less of a priority. . . . The last thing I want to happen is to make my team feel they can't come to me for help."[47]  Ms. Bertsch sent similar emails to Mr. Jourdane[48] and Mr. Fletcher.[49]

At trial, Ms. Bertsch testified that she did not believe that she had a behavior problem or that she had caused issues in the Media Department.[50] Ms. Bertsch testified that she had spoken with her mother, who instructed her to apologize, despite the fact that Ms. Bertsch felt that she had not offended her coworkers.  Ms. Bertsch attributes her decision to send the apology emails to the fact that her parents were unable to provide her with financial support.

---

[46] Trial Ex. 11.

[47] Trial Ex. 8.

[48] Trial Ex. 10.  Mr. Jourdane responded: "Why did you send me this?  I don't have a clue what you're talkinhg [sic] about."  *Id.*

[49] Trial Ex. 9.  In his response, Mr. Fletcher acknowledged that Ms. Bertsch had problems with others in the Media Department, but he wrote that no apology was necessary because Ms. Bertsch had never upset him.  He referenced their professional relationship and her completion of work.  *Id.*  In a candid response, Ms. Bertsch wrote: "I was told that there were people in the department that said I made them uncomfortable, they were intimidated by me, and that they felt they had to bribe me to get their work done.  So, since I did not know who was talked to, I sent everyone a personal apology.  God knows I need to, even my family has told me I can be a bitch at times.  I would hope that if I ever do offend you or make you feel uncomfortable, that you would let me know."  *Id.*

[50] Trial Tr. 262:22-25.

Because Ms. Bertsch had apologized, taken accountability, and promised to improve, Mr. Popelka and Ms. Simon ultimately decided to not relocate Ms. Bertsch to the warehouse.[51]  Ms. Bertsch retained the same position and pay, and she continued to work part-time at the corporate location and part-time at the warehouse.  However, as discussed below, both Ms. Bertsch and Mr. Latimer would be subject to corrective action for contributing to a tense work environment.

**G.     Corrective Action Plan**

Consistent with the scope and focus of the Human Resources investigation, Overstock pursued corrective action against both Mr. Latimer and Ms. Bertsch.  Ms. Howard testified that Ms. Bertsch was not given the corrective action plan because of her complaints about Mr. Latimer's behavior, but instead because Ms. Bertsch "needed to make some improvement in her workplace behavior."[52]  And Ms. Simon, who ultimately made the decision to issue the corrective action plan,[53] testified that she was unaware at that time of any complaints relating to Mr. Latimer "engaging in sexually harassing misconduct."[54]  Accordingly, the court finds that Overstock's decision to issue a corrective action plan to Ms. Bertsch was unrelated to her complaints about Mr. Latimer's office behavior.[55]

---

[51] *Id.* at 413:4-10.  The court cannot find that Ms. Bertsch was instructed to spend two weeks at the warehouse, because Ms. Bertsch's testimony was not corroborated by additional testimony or actual events.

[52] *See id.* at 100:24-101:7.  At trial and in her deposition, Ms. Simon could not identify the "impetus" for her decision or recall who recommended corrective action.  But this is not inconsistent with her credible testimony that she ultimately elected for the corrective action based on the severity of the vendor email incident.

[53] *Id.* at 157:2-6.

[54] *Id.* at 453:2-7.

[55] The court further finds that Ms. Howard, who no longer works for Overstock but participated throughout the investigation and corrective action plan, credibly testified that Ms. Bertsch did not receive the corrective action plan because she complained about Mr. Latimer.  *Id.* at 100:24-101:7.

Mr. Latimer received a corrective action plan on February 24, 2004.[56]  His disciplinary notice identified the problem as "complaints that [Mr. Latimer] contributes to a hostile work environment [including] abusive behavior by way of manner and sarcasm [and the fact that Mr. Latimer] insulted a co-worker by e-mail to a vendor."[57]  Mr. Latimer was instructed to: "Work with manager and other employees to improve working relationships with department personnel. Abstain from making derogatory remarks about sex and gender."[58]  The consequence for failure to improve would be "removal from team and/or termination."[59]  Mr. Latimer indicated that he held "reservations about elements of the above accusations" but that he understood "there are improvements I can make to facilitate greater teamwork and department harmony."[60]

Ms. Bertsch received her written corrective action plan during a meeting with Mr. Popelka on February 26, 2004.  Similar to Mr. Latimer's corrective action plan, Ms. Bertsch's notice articulated the problem as "complaints that [Ms. Bertsch] contributes to a hostile work environment [including] abusive behavior by way of manner and sarcasm.  [Ms. Bertsch] has shown a pattern of not supporting coworkers [sic] business needs and she needs to prioritize her tasks more effectively."[61]  Ms. Bertsch was instructed to: "Work with manager and other employees to improve working relationships with department personnel.  [Ms. Bertsch] will treat all co-workers fairly and prioritize her work based on business needs.  [Ms. Bertsch] will work

---

[56] Trial Ex. 7.

[57] *Id.*

[58] *Id.*  Mr. Latimer had received a prior verbal warning on May 6, 2003 for "failure to work cooperatively with others and demonstrated discourtesy."

[59] *Id.*

[60] *Id.*

[61] Trial Ex. 12.  The disciplinary notice referenced Ms. Bertsch's 2004 Annual Review, in which Mr. Popelka and Ms. Bertsch discussed her need "to work better within the team dynamic."  *Id.*; *see also* Trial Ex. 2.

on being more consistent in her interactions with others."[62]  The consequences of failure to improve would be "removal from team and/or termination."[63]  Given an opportunity to respond, Ms. Bertsch wrote that, after evaluating her behavior, she had been "contributing to some department contention [and] would like the opportunity to personally apologize to those I have offended to help make amends."[64]  As a result of the meeting, Mr. Popelka was encouraged by the fact that Ms. Bertsch promised to improve her behavior.[65]  During trial, Ms. Bertsch testified that her statements were untrue and that she made these comments in an effort to save her job.[66]

Ms. Howard testified that when she used the term "hostile work environment" in the corrective action notices she meant "uncomfortable, contentious."[67]  Ms. Howard intended Ms. Bertsch's plan to address "her need to treat coworkers fairly and prioritize her work based on business needs rather than personality differences."[68]  Ms. Howard credibly testified that Ms. Bertsch's corrective action plan was intended to improve her workplace behavior, and that the corrective action plan was not given to her because she complained about Mr. Latimer.[69]  Ms. Howard received no complaints from Ms. Bertsch about Mr. Latimer after February 24, 2004.

## H.  Warehouse Incident

After receiving the corrective action plan, Ms. Bertsch returned to her normal duties with one exception.  In an effort to alleviate her workload, Overstock assigned other employees to

---

[62] Trial Ex. 12.

[63] *Id.*

[64] *Id.*

[65] Trial Tr. 414:1-3.

[66] *See id.* at 262:22-25; 324:10-13; 353:17-354:12.

[67] *Id.* at 100:8-11.

[68] *Id.* at 100:13-15.

[69] *Id.* at 100:24-101:7.

assist Ms. Bertsch.  Ms. Bertsch was given the responsibility of cross-training these employees. As already discussed, both prior to and after the vendor email incident, Ms. Bertsch continued to split her time between the corporate office and warehouse location.

During the next few months, Ms. Bertsch began to exhibit some of the same behavioral and team dynamic issues that had given rise to the corrective action plan and criticism during her 2003 and 2004 Annual Reviews.  These issues came to a head on May 12, 2004, when the warehouse manager, Dan McKnight, forwarded an email chain to Mr. Popelka.[70]  According to Mr. McKnight, Ms. Bertsch's response to an inquiry into unaccounted inventory was "a little dramatic and has caused some issues [in the warehouse]."[71]  Mr. McKnight wrote: "I appreciate the fact that this was probably supposed to be taken care of prior, but the language that [Ms. Bertsch] chose to use is only adding fuel to the fire."[72]

For Mr. Popelka, the warehouse incident raised concerns because it reflected the same issues that previously had been discussed with Ms. Bertsch, and because the same problems appeared to have spread to the warehouse and a different group of people, despite Ms. Bertsch's commitment to improve.[73]  And the warehouse incident suggested to Mr. Popelka that Ms. Bertsch continued to fail to take personal accountability, properly prioritize work, or support the team.[74]  Because he felt that Ms. Bertsch continued to fail to correct her behavior and because he

---

[70] Trial Ex. 13, at 1.

[71] *Id.*

[72] *Id.*

[73] *See* Trial Tr. 231:20-22 ("And so to me it continued this pattern that she wasn't going to get along with anybody no matter where she was working.").

[74] *See id.* at 417:2-19, 417:24-418:6.

was unsure "what else we can do to get her to perform in her job function," Mr. Popelka went to Ms. Simon to discuss the appropriate response.[75]

## I.       Termination

After speaking with Mr. Popelka, Ms. Simon decided to terminate Ms. Bertsch's employment.  Ms. Simon testified that she wanted Ms. Bertsch to succeed at Overstock, but recognized the tension between Ms. Bertsch and her coworkers. Ms. Simon explained that "when you have hundreds of employees and you find yourself spending a percentage of time with the same ones over the same issues, that there just becomes a point for both parties that you should simply part ways, and that's where I was in regards to [Ms. Bertsch]."[76]  Ms. Simon credibly testified that there were multiple bases for the termination, including Ms. Bertsch's failure to cross-train support staff, her creation of disharmony at the warehouse, and her failure to properly prioritize projects.[77]

Mr. Popelka identified several reasons for Ms. Bertsch's termination.  He testified that she was terminated because she caused disharmony at the warehouse.[78]  Mr. Popelka concluded Ms. Bertsch "was not participating in the very issue that she had raised, which was to provide relief from this workload issue [by cross-training employees]."[79]  He also expressed concern about her sarcasm and playing video games.  Mr. Popelka had accepted as true Ms. Bertsch's representations in January 2004 that she contributed to a tense relationship with Mr. Latimer.

---

[75] *Id.* at 417:20-418:6.

[76] *Id.* at 162:21-163:1.

[77] *See, e.g.*, *id.* at 448:1-449:19, 452, 355:20-456:1.

[78] *Id.* at 229:2-7.

[79] *Id.* at 415: 13-16.

Ms. Bertsch's formal disciplinary notice identified several reasons for her termination.[80] Citing the warehouse incident as an example, the notice stated that Ms. Bertsch "has not consistently improved her ability to work well within the team dynamic."[81] The notice listed the 2004 Annual Review and February 24, 2004 written warning as prior warnings on the subject. And it reiterated the specific company policies at issue: "Unwillingness to work in harmony with others, discourtesy, and contact creating irritation or friction. Failure to work cooperatively with others or demonstrated courtesy is unacceptable."[82]

Attached to the termination notice was a list of additional reasons for the termination.[83] This list referenced Ms. Bertsch's resistance to cross-training of team members,[84] her difficulty in communicating with managers about projects, her isolation from team members, her attitude and its negative relationship to productivity, two instances of playing video games, and the effect of Ms. Bertsch's sarcastic and insubordinate comments on the team dynamic.[85]

At trial, Ms. Bertsch testified that she was told that her "behavior hadn't improved, and my work wasn't being completed in . . . a manner beneficial to the company, and that they were

---

[80] Trial Ex. 14.

[81] *Id.* at OSTK13.

[82] *Id.*

[83] *Id.* at OSTK14. Ms. Howard testified that it would have been her normal practice to have a manager create a summary of the reasons for termination. Trial Tr. 106:7-16. Mr. Popelka credibly testified that these were the issues that he and Ms. Simon considered as a basis for termination. As a result, while it is true that Mr. Popelka appears to lack an independent recollection of creating "Exhibit 4A," the court rejects Ms. Bertsch's argument that its contents were manufactured after the termination as a pretextual response to the UALD's investigation.

[84] In her proposed factual findings, Ms. Bertsch argues that termination based on failure to cross-train Ms. Clark is inconsistent with the Overstock's theory that no transfer to the warehouse took place. *See* Dkt. 100, at 22-25. The court disagrees for three reasons. First, the court finds that Ms. Bertsch was instructed to cross-train several coworkers, including Ms. Clark, who was hired to alleviate Ms. Bertsch's workload. Second, Ms. Bertsch herself admitted that she did not complete cross-training of at least one coworker. Third, the court notes that the core reason for Ms. Bertsch's termination was her failure to consistently improve her working relationship with the team. *See, e.g.*, Trial Ex. 18. In this respect, any failure to cross-train appears to be a secondary basis for termination—rather than a fatal flaw that demonstrates pretext.

[85] Trial Ex. 14, at OSTK14.

letting me go."[86]  Ms. Bertsch admitted she was responsible for cross-training Mr. Hoy and Mr. Allgood, and that this cross-training had not been completed by May 2004.  Ms. Bertsch testified that her work demanded deep concentration and that she used earbuds at work to eliminate and ignore outside noise.  But she testified that her use of earbuds and her isolation from fellow employees was never discussed with her.  Ms. Bertsch also admitted to playing video games at work, but she testified that she did so during her breaks and lunches at the request of Mr. Allgood, the video game buyer.  Finally, while she admitted to being sarcastic, Ms. Bertsch attempted to explain that all of her coworkers also used sarcasm in the workplace.

The parties dispute who had the ultimate authority to terminate Ms. Bertsch.[87]  While the court recognizes that the evidence points both ways on this issue, the court finds that Mr. Popelka and Ms. Simon credibly testified that Ms. Simon ultimately made the decision to terminate Ms. Bertsch.  And Ms. Simon credibly testified that only she could make the decision to terminate an employee.  At the same time, Mr. Popelka clearly contributed to the decision-making process.[88]

At the time she made the decision to terminate Ms. Bertsch, Ms. Simon was unaware of any formal complaints by Ms. Bertsch of sexual harassment or a hostile work environment.  Ms. Simon credibly testified that she and Mr. Popelka did not discuss Ms. Bertsch's allegations of sexual harassment or hostile work environment when deciding to terminate her employment in May 2004.  The extent of Mr. Popelka's knowledge is less clear.  Mr. Popelka testified that at the

---

[86] Trial Tr. 274:25-275:3; *see also id.* at 276:16-18 ("I just remember them saying that I was fired for my behavior not improving and my quality of work suffering.").

[87] In her papers, Ms. Bertsch points to Overstock's summary judgment briefing and argues that Overstock should be judicially estopped from arguing that Ms. Simon ultimately terminated Ms. Bertsch.  The court disagrees and declines to apply the doctrine of judicial estoppel.  Instead, the court rests its findings on the evidentiary record in its entirety, weighing the credibility of witnesses at trial.

[88] Ms. Howard also testified that she aided in the decision-making process and agreed with the ultimate outcome.  *Id.* at 88:1-2, 107:1-11.  Ms. Howard also assisted by preparing the termination documents.

time he met with Ms. Simon, he was unaware that Ms. Bertsch had made formal complaints about Mr. Latimer's inappropriate behavior.[89]   At the same time, however, Mr. Popelka appears to have been made aware, both during informal hallway conversations and the corrective action plan meetings, of the general nature of the dispute between Ms. Bertsch and Mr. Latimer.

The court is mindful of conflicting evidence concerning the impetus of Ms. Bertsch's termination and the inevitable deterioration of memories that is an unwanted product of protracted litigation.   Nevertheless, after careful consideration of the testimony of the witnesses and evidence presented at trial, the court finds that Ms. Simon and Mr. Popelka did not terminate Ms. Bertsch because of any prior complaints about Mr. Latimer or the work environment,[90] and that Ms. Simon and Mr. Popelka neither discussed nor considered Ms. Bertsch's allegations as part of their deliberations about the appropriate employment action when they resolved to terminate her employment in May 2004.

### J.    Alleged Disparate Enforcement

In her papers, Ms. Bertsch argues that Overstock's treatment of Mr. Latimer demonstrates pretext.  While the court questions the relevancy of Mr. Latimer's treatment[91] and the weight of the documents cited by Ms. Bertsch given the absence of corroborating testimony, the court makes five general findings.

First, Mr. Latimer received a verbal warning for failing to pull his weight and verbally abusing coworkers in May 2003.[92]   The consequence of failure to improve was a written

---

[89] *Id.* at 418:18-22.

[90] The court further notes that Ms. Howard credibly testified that termination was unrelated to Ms. Bertsch's complaints of how Mr. Latimer treated women.  *Id.* at 110:22-111:6.

[91] The Tenth Circuit affirmed judgment in favor of Overstock on Ms. Bertsch's disparate treatment claim.

[92] Trial Ex. 23, at OSTK123.

warning.[93]   Second, in addition to the corrective action discussed above, Mr. Latimer received a

second written warning in July 2005, after an outburst at a business lunch in which Mr. Latimer

appears to have said: "Baker and Taylor can go F*** themselves."[94]   Third, three of Mr.

Latimer's disciplinary notices reference Overstock's policy on "Unwillingness or inability to

work in harmony with others, discourtesy, conduct creating disharmony, irritation or friction."[95]

Fourth, while the same policy is mentioned, the factual predicate for each of the disciplinary

notices differed in scope and severity from Mr. Latimer's corrective action plan in February

2004.[96]   Fifth, Mr. Latimer stayed employed at Overstock until November 2010.

## CONCLUSIONS OF LAW

At trial, Ms. Bertsch offered no direct evidence in support of her retaliation claim.  Based

on the stipulation of the parties, the court will apply the *McDonnell Douglas* burden-shifting

framework.[97]   Under *McDonnell Douglas*, a plaintiff ordinarily must first present sufficient

evidence to establish a prima facie case of discrimination. [98] After the plaintiff has done so, the

burden shifts to the employer to present a legitimate, non-retaliatory reason for the employer

action.[99]   "The plaintiff must then show that the employer's reason was a mere pretext for

retaliation."[100]

---

[93] *Id.*

[94] *Id.* at OSTK126.

[95] *Id.* at OSTK123, OSTK-125-OSTK126.  The February 2004 disciplinary notice references the same policy but uses slightly different language.

[96] The court gave little weight to the reference to the same corporate policy in Mr. Latimer's disciplinary notices, in part because Ms. Bertsch declined to put on additional evidence about the factual basis for the disciplinary action.

[97] Trial Tr. 523:22-524:6.

[98] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1278 (10th Cir. 2010); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).

[99] *Bertsch v. Overstock.com*, 684 F.3d 1023, 1028 (10th Cir. 2012).

[100] *Id.* at 1028-29.

The Supreme Court has cautioned that while the "intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"[101]  Nevertheless, because the parties have stipulated to and requested a *McDonnell Douglas* analysis, the court will discuss each of its three steps in turn.

**I.**    **PRIMA FACIE CASE OF RETALIATION**

"A prima facie retaliation case is made if the plaintiff shows that she engaged in protected opposition to discrimination, and, as a result, suffered materially adverse action, i.e., action sufficient to 'dissuade' a reasonable worker from making her complaint."[102]  Stated differently, Ms. Bertsch must show "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[103]

**A.**    **Protected Opposition**

To engage in protected opposition, a plaintiff must possess a reasonable, good-faith belief that the conduct at issue violated Title VII.[104]  Protected opposition may include "filing formal charges to voicing informal complaints to superiors."[105]  A complaint of sexual harassment, for example, "unquestionably constitutes protected activity."[106]

---

[101] *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (citation omitted).

[102] *Bertsch*, 684 F.3d at 1028 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

[103] *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) (internal quotation marks and citation omitted).

[104] *Crumpacker v. Kansas Dep't of Human Res.*, 338 F.3d 1163, 1171 (10th Cir. 2003).

[105] *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004).

[106] *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008).

At the same time, however, the Tenth Circuit has held that offhand comments and isolated incidents do not ordinarily constitute a Title VII violation.[107]  Rather, the employee must demonstrate the work environment is "both objectively and subjectively hostile or abusive" under a "totality of the circumstances."[108]  Stated differently, a plaintiff alleging hostile work environment must show that a reasonable person would believe "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[109] In some cases, this may be done by a showing of gender animus or gender-based comments.[110]

Here, the court finds that Ms. Bertsch engaged in protected activity when she reported Mr. Latimer's inappropriate behavior during a meeting with Ms. Howard in February 2004.  Ms. Bertsch harbored a subjective belief that Mr. Latimer's comments constituted sexual harassment, and that his behavior towards her and female coworkers created a hostile work environment. Looking at the totality of the circumstances, the court finds that a reasonable person would have believed that Mr. Latimer's conduct, as described above, was sufficiently severe or pervasive as to create an abusive working environment. [111]  Accordingly, Ms. Bertsch satisfies the first prong of the prima facie inquiry.

---

[107] *Morris v. City of Colorado Springs*, 666 F.3d 654, 664 (10th Cir. 2012) ("Title VII does not establish a general civility code for the workplace." (internal quotation marks and citations omitted)).

[108] *Id.* (internal quotation marks and citation omitted).

[109] *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007).

[110] *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005).

[111] *See supra* Findings of Fact, Parts C & E.

### B.     Materially Adverse Action

An action is materially adverse if that action is "harmful to the point that [it] might well dissuade a reasonable worker from making or supporting a charge of discrimination."[112]  Context drives this inquiry, which is necessarily dependent upon the facts of each individual case.[113]  For example, while the Supreme Court has cautioned that not every reassignment is "automatically actionable," reassigning an employee to a more arduous, dirtier, less prestigious, or objectively worse job may constitute a materially adverse action in some circumstances.[114]

Ms. Bertsch argues that three incidents rise to the level of materially adverse actions: (1) the threat on February 25, 2004 to move Ms. Bertsch to the warehouse; (2) the corrective action plan received by Ms. Bertsch on February 26, 2004; and (3) her termination on May 17, 2004.

The court concludes that each of these events could dissuade a reasonable worker from making a charge of discrimination.  Although the court disagrees in part with Mr. Bertsch's characterization of her discussions with Mr. Popelka about the possibility of relocating Ms. Bertsch to the warehouse,[115] a reasonable worker might be dissuaded from making a charge of discrimination if they understood that the employer might require her to relocate to a location that both the manager and employee agreed would be a less pleasant environment and physically removed from the rest of the team.  Similarly, a reasonable employee in Ms. Bertsch's position could be dissuaded from making a charge of discrimination if the result would be a corrective action plan that expressly references termination as the possible outcome if the employee fails to

---

[112] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

[113] *Burlington N. & Santa Fe Ry. Co.,* 548 U.S. at 71 (instructing courts to evaluate the action "from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances" (internal quotation marks and citations omitted)).

[114] *Id.*

[115] Ms. Bertsch's counsel described this interaction as a "threat," but a more credible and accurate description of events is found in Mr. Popelka's testimony.  *Supra* Findings of Fact, Part F.

improve. And termination clearly would deter a reasonable employee from bringing a hostile work environment to her employer's attention.[116] Accordingly, Ms. Bertsch satisfied her burden of demonstrating sufficient evidence of a materially adverse employment action.

### C. Causal Connection

In the Tenth Circuit, a party may demonstrate a causal connection by demonstrating a close temporal connection between the protected activity and the adverse action.[117] Although "a three-month period, standing alone, is insufficient to establish causation," courts have held that a six or nine week period may rise to the level of causal connection.[118] But the causal inquiry does not end at temporal proximity. In the Tenth Circuit, a party may also establish a prima facie causal connection, even when months have passed, by presenting evidence that a desire to retaliate for protected activity motivated the employer's conduct.[119] To do so, the employee must present evidence that the person who ultimately decided to take the adverse action possessed knowledge of the protected activity or that a person who harbored the discriminatory animus "knew and used . . . the person who effected the adverse action, 'as a cat's paw to effect . . . her own biased designs.'"[120] The Tenth Circuit has also recognized that a plaintiff may satisfy the causation prong by presenting sufficient evidence of pretext.[121]

In this case, Ms. Bertsch satisfied her burden of presenting prima facie evidence of a causal connection between her complaints in February 2004, her supervisors' suggestion that she

---

[116] *Hinds v. Sprint/United Mgmt. Co*., 523 F.3d 1187, 1202 (10th Cir. 2008).

[117] *Anderson v. Coors Brewing Co*., 181 F.3d 1171, 1179 (10th Cir. 1999) (assuming two weeks and one month would be sufficient to support a prima facie case of retaliation).

[118] *Id.*

[119] *Hinds,* 523 F.3d at 1203.

[120] *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) (quoting *Young v. Dillon Companies, Inc*., 468 F.3d 1243, 1253 (10th Cir. 2006)); *see also Hinds*, 523 F.3d at 1203.

[121] *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1209-10 (10th Cir. 2007).

relocate to the warehouse on a full-time basis, and the corrective action plan.  Because all of these events occurred within a matter of a couple of weeks, there is sufficient evidence of a causal connection for the court to move forward to the second phase of the *McDonnell Douglas* test without considering other factors that may weigh in favor of or against causation.

At the same time, the court concludes that Ms. Bertsch failed to demonstrate a causal connection between her termination and the protected activity for four reasons.  First, nearly three months separate her protected activity and the termination and, as a result, Ms. Bertsch cannot rely on temporal proximity alone to establish causation.[122]  Second, Ms. Simon, the person ultimately responsible for Ms. Bertsch's termination, credibly testified that she did not possess any knowledge of Ms. Bertsch's protected activities at that time and that they did not factor into her decision to terminate Ms. Bertsch.[123]  Ms. Simon's testimony, in turn, is supported by testimony from Mr. Popelka and Ms. Simon.[124]  Third, there is neither sufficient evidence nor argument for the court to conclude that either Mr. Popelka or Ms. Howard used Ms. Simon as a "cat's paw to effect" their own designs against Ms. Bertsch.[125]  Fourth and finally, for the reasons discussed below, the court concludes that the bases for terminating Ms. Bertsch were not

---

[122] *See Hinds,* 523 F.3d at 1204 (discussing three-month time period); *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1183 (10th Cir. 2002) (concluding causal connection not established when "[a]lmost three months" separated the protected activity and adverse action).

[123] *See Zokari v. Gates,* 561 F.3d 1076, 1081-82 (10th Cir. 2009) (concluding employee failed to demonstrate a causal connection when he could not show that the individuals who took the adverse action were aware of the protected opposition).

[124] *See* Findings of Fact, Parts C, E, & I.

[125] Ms. Bertsch raised a "cat's paw" theory in passing during her closing argument, relying on *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 486 (10th Cir. 2006).  Although Mr. Popelka and Ms. Howard consulted with Ms. Simon about the appropriate course of action at various stages of Ms. Bertsch's employment, the court concludes that the doctrine should not be applied in this instance, where there is no evidence that either subordinate employee possessed the requisite animus or influence to use Ms. Simon.  *Id.* at 486-88.  Furthermore, Ms. Simon independently observed Ms. Bertsch in the workplace and during the vendor email incident, which led her to make her own conclusion about the appropriate course of action.  *See Macon v. United Parcel Serv.*, Inc., 743 F.3d 708, 715 (10th Cir. 2014) (holding doctrine did not apply when supervisor independently assessed misconduct).

pretextual.[126]  Accordingly, Ms. Bertsch has not shown that protected activity caused her termination.

## II.  LEGITIMATE NON-DISCRIMINATORY REASONS FOR OVERSTOCK'S CONDUCT

Because Ms. Bertsch presented prima facie evidence of retaliation, the burden shifts to Overstock to demonstrate "a legitimate, non-discriminatory reason for the adverse action."[127] After careful consideration of the evidence and testimony, the court concludes that Overstock met its burden for each of the adverse actions discussed above.

Overstock's decision to discuss the possibility of relocating Ms. Bertsch to the warehouse was supported by a legitimate, non-discriminatory reason.  Ms. Howard's investigation revealed friction between Ms. Bertsch and her coworkers.  Ms. Bertsch already maintained an office at the warehouse and spent time there.  When discussing the possibility of a full-time relocation, Ms. Bertsch's supervisors hoped to alleviate the tensions arising out of the contentious work environment that Ms. Howard discovered during the course of her investigation into the vendor email incident.  Mr. Popelka also credibly testified that he believed relocation to the warehouse would allow Ms. Bertsch to better focus on her work and to improve productivity.  Each of these considerations falls well within the business judgment of an employer faced with day-to-day human resources decisions.

Similarly, legitimate, non-discriminatory reasons drove Overstock's decision to issue a corrective action plan to Ms. Bertsch.  Because of the vendor email incident, the subsequent

---

[126] *Compare infra* Conclusions of Law, Part III.C, *with* Dkt. No. 100, at 34 (citing *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1211 (10th Cir. 2007)).  Ms. Bertsch argues, albeit briefly, that a party may demonstrate a causal connection by showing a pattern of retaliatory conduct.  For this proposition, Ms. Bertsch relies on *Fowler v. Westminster Coll.*, No. 2:09-CV-00591, 2012 WL 4378097 (D. Utah Sept. 25, 2012).  *Fowler* is distinguishable and, in any event, there are not sufficient facts to support a pattern of retaliation in this case.

[127] *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1266 (10th Cir. 2007) (quoting *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996)).

investigation, and particularly in light of her previous annual reviews, Ms. Bertsch's supervisors possessed a credible belief that she needed to improve her relationship with other members of the team, treat members of the team equally, more fairly prioritize her work, and focus on improving the consistency of her interactions.  In this respect, Ms. Bertsch's conduct towards coworkers, her failure to prioritize work, and her participation in the vendor email incident provided legitimate, non-discriminatory bases for Overstock to issue a written warning in the form of a corrective action plan.

Finally, while the court has found that Ms. Bertsch failed to establish a prima facie case for her termination, the court will identify Overstock's legitimate, non-discriminatory reasons for Ms. Bertsch's discharge insofar as it is relevant to the pretext analysis.  Overstock identified several legitimate, non-discriminatory bases for Ms. Bertsch's termination, including her failure to improve working within the team dynamic, her failure to complete cross-training, her self-imposed isolation from coworkers, her decision to play videogames at work, and her contribution to workplace disharmony.  While each of these factored into Overstock's decision to terminate Ms. Bertsch's employment, the reemergence of old issues in a different environment with a new set of coworkers produced legitimate cause for concern.  For all of these reasons, Overstock had legitimate bases for concluding that further corrective action would no longer be sufficient to cure Ms. Bertsch's conduct or her effect on the work environment.

Because Overstock provided a legitimate, non-discriminatory justification for each of the three challenged adverse actions, the burden again shifts to Ms. Bertsch to demonstrate "that the proffered reason actually is pretext masking discriminatory animus."[128]

---

[128] *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007).

### III.   PRETEXT ANALYSIS

To demonstrate pretext, a plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."[129]  The Tenth Circuit has repeatedly cautioned that Title VII does not transform the court into a "super personnel department."[130]  A court's role "isn't to ask whether the employer's decision was wise, fair or correct, but whether [it] honestly believed [the legitimate, nondiscriminatory] reasons [it gave for its conduct] and acted in good faith on those beliefs."[131]  Accordingly, an employee must "produce evidence that the employer did more than get it wrong [and] must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda."[132]

Courts in this Circuit have adopted a number of tools for evaluating pretext.  A plaintiff may show "the employer's proffered reason was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief."[133]  In doing so, a plaintiff may rely on evidence and appropriate inferences from his prima facie case, but the presumption of discrimination "drops out of the picture."[134]  A plaintiff may also make a showing of pretext by presenting "(1) evidence that defendant's stated reason for the adverse employment action was false; (2) evidence that the defendant acted contrary to a written . . . policy prescribing the action to be

---

[129] *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 143 (2000) (internal quotation marks and citation omitted).

[130] *Johnson v. Weld Cnty., Colo*., 594 F.3d 1202, 1211 (10th Cir. 2010).

[131] *Id.* (internal quotation marks omitted).

[132] *Id.*

[133] *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007) (quoting *Miller v. Auto. Club of New Mexico, Inc.*, 420 F.3d 1098, 1123 (10th Cir. 2005)) (requiring courts to evaluate facts from the perspective of the person who made the adverse action, as opposed to the aggrieved employee, when evaluating the truth of the employer's belief).

[134] *Reeves*, 530 U.S. at 143 (recognizing that prima facie proof, taken together with proof that an "explanation is unworthy of credence," may permit the fact finder "to infer the ultimate fact of intentional discrimination" but also noting that this alone may not support liability in all cases).

taken by the defendant under the circumstances; or (3) evidence that the defendant acted contrary to an unwritten policy or contrary to [the employer's] practice when making the adverse employment decision affecting the plaintiff."[135]

Although Ms. Bertsch organized her closing argument and the proposed conclusions of law around a general pretext theory—as opposed to addressing each particular adverse action—this court will consider each adverse action in turn and evaluate "the facts as they appear to the person making the [adverse employment] decision."[136] For the reasons stated below, none of Ms. Bertsch's arguments, either standing alone or taken as a whole, support a finding of pretext.

### A.     Warehouse Relocation

With respect to the proposal that Ms. Bertsch relocate full-time to the warehouse, the court concludes that Ms. Bertsch's supervisors held a good-faith belief that temporary relocation would decrease contention between members of the Media Department and allow Ms. Bertsch to focus on her work and improve her productivity, especially given the recent tension caused by the vendor email incident.  This conclusion is further supported by the fact that Ms. Simon and Mr. Popelka apparently abandoned the plan after Ms. Bertsch took affirmative steps to address the issues that had necessitated their proposal in a series of emails to her supervisors and coworkers.[137]  More importantly, at the time of the proposed warehouse relocation, Ms. Simon lacked any knowledge of the protected activity, and Mr. Popelka had recently conducted an annual review in which Ms. Bertsch agreed that she needed improve working within the team

---

[135] *Macon*, 743 F.3d at 714 (alteration in original) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

[136] *Kendrick*, 220 F.3d at 1231.

[137] *Supra* Findings of Fact, Part F.

dynamic.  In sum, Ms. Bertsch has not demonstrated that her protected activity, as opposed to the

vendor email incident, was Overstock's "true reason" for the proposed relocation.

**B.      Corrective Action Plan**

Turning to the corrective action plan, Ms. Bertsch failed to prove that Overstock's efforts

to respond to the vendor email incident and a subsequent investigation into tensions between Ms.

Bertsch and members of the Media Department were pretextual.

At the time of the decision to adopt a corrective action plan, the personal dispute between

Ms. Bertsch and Mr. Latimer was perceived as threatening workplace harmony and a relationship

with an important vendor.  Ms. Howard credibly testified that her investigation into the vendor

email incident revealed issues with how Ms. Bertsch interacted with her coworkers, prioritized

work, and contributed to a contentious work environment.  Mr. Popelka had recently completed

Ms. Bertsch's 2004 Annual Review, during which Ms. Bertsch recognized the need to improve

working within the team dynamic.  And Ms. Simon, who received the vendor email, lacked any

knowledge of Ms. Bertsch's protected activity.[138]  For all of these reasons, the court concludes

that Ms. Simon and Mr. Popelka possessed a good-faith belief that corrective action was

necessary to ensure improvements in workplace behavior.  Simply put, Overstock's decision to

issue a corrective action plan was unrelated to Ms. Bertsch's prior complaints.

Moreover, Overstock issued a nearly identical disciplinary warning to Mr. Latimer.  The

similarity between the corrective action plans suggests that Overstock intended each corrective

action plan to be a good-faith effort to exercise its business judgment in managing workplace

behavior, as opposed to hidden discriminatory retaliation against a single employee.  For all of

---

[138] *See* Findings of Fact, Parts E-I.

these reasons, the court concludes that Ms. Bertsch has not demonstrated by a preponderance of evidence that Overstock's reasons for the corrective action plan were pretextual.

### C.        Termination

Much of Ms. Bertsch's pretext argument centered on her termination.[139]  Ms. Bertsch presented five general and overlapping theories of pretext.  First, Ms. Bertsch argues that the primary basis for her termination—failure to improve within the team dynamic— is implausible, inconsistent, and contradictory.[140]  Ms. Bertsch attempts to establish this by impeaching the testimony of Ms. Simon and Mr. Popelka, based in part on arguments raised at the summary judgment stage.  She also points to emails from several of her coworkers disclaiming any knowledge of problems with her behavior.  Second, Ms. Bertsch maintains that Overstock's reasons for her termination changed over time.[141]  She emphasizes in particular questions concerning the amount of time she spent at the warehouse.  Third, Ms. Bertsch argues that Overstock's failure to list all of the reasons for termination in her written notice is indicative of pretext.[142]  Fourth, Ms. Bertsch maintains that Overstock's concern over her failure to cross-train employees was pretextual.[143]  Fifth and finally, Ms. Bertsch argues that Overstock failed to uniformly enforce its rules when it fired Ms. Bertsch for a pattern of activity but later failed to terminate Mr. Latimer, despite the fact that he was written up on several occasions.[144]  For the

---

[139] *See, e.g.*, Trial Tr. 488-495; Dkt. No. 100, at 42-44.

[140] Dkt. No. 100, at 42-43; *see* Trial Tr. 495-499 (discussing attempts to impeach Mr. Popelka and Ms. Simon).

[141] Dkt. No. 100, at 43; Trial Tr. 488-89.

[142] Dkt. No. 100, at 43-44; Trial Tr. 489-90.

[143] Dkt. No. 100, at 43; Trial Tr. 490-94.

[144] Dkt. No. 100, at 44; Trial Tr. 494-495.

reasons stated below, the court concludes that Ms. Bertsch failed to demonstrate that her termination was pretextual.[145]

Several of Ms. Bertsch's arguments are inconsistent with the court's factual findings. For example, the court finds that Ms. Simon and Mr. Popelka credibly testified that the termination was unrelated to the Ms. Bertsch's prior complaints. Ms. Simon, in particular, credibly testified that she possessed no knowledge of Ms. Bertsch's protected activity until after the termination. Importantly, Ms. Bertsch's supervisors had instructed her of the need to improve working within the team dynamic on several occasions prior to her termination. Rather than disagree with her supervisors, Ms. Bertsch promised to improve on multiple occasions.

This court is instructed to evaluate the facts from the perspective of the employer at the time of the adverse employment decision.[146] After the 2004 Annual Review, the vendor email incident, the subsequent investigation, Ms. Bertsch's apology emails, the corrective action plan meeting, and the warehouse incident, Mr. Popelka and Ms. Simon possessed a good-faith belief that Ms. Bertsch would continue to contribute to a contentious work environment and that termination was an appropriate course of action. Or stated in different terms, Ms. Bertsch has not demonstrated the falsity of the stated reason for her termination[147] or that the determinative factor behind her termination was retaliation for protected activity.[148]

---

[145] As discussed above, the court concluded that Ms. Bertsch failed to satisfy her burden of presenting a prima facie case of retaliation for her termination. *See supra* Conclusions of Law, Part I.C.

[146] *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007) (quoting *Miller v. Auto. Club of New Mexico, Inc.*, 420 F.3d 1098, 1123 (10th Cir. 2005)).

[147] "[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147-48 (2000).

[148] When evaluating whether an employer acted in "bad faith to cover up a discriminatory purpose," the Tenth Circuit has held that the finder of fact must be able to conclude that "'discrimination was a determinative factor in

Ms. Bertsch's pretext theory also relies in part on a mischaracterization of the weight and probative value of select evidence.  For example, while a few coworkers responded to Ms. Bertsch's emailed apology with kind words or confusion, the investigation and language of the correspondence indicated that Ms. Bertsch contributed to significant tension within the Media Department.  Similarly, although Ms. Bertsch raised questions of whether she was responsible for cross-training Ms. Clark and whether she spent time at the warehouse, Ms. Bertsch cannot dispute that she continued to work part-time at the warehouse and failed to complete cross-training of Mr. Hoy or Mr. Allgood by May 2004.  And while the termination notice itself did not contain every issue that factored into Overstock's consideration of the best course of action, it undoubtedly identified her supervisors' primary concerns, which centered on her failure to improve in the areas identified during Ms. Bertsch's annual review or the corrective action plan. For these reasons, Ms. Bertsch's one-sided presentation of evidence does not persuade the court that her supervisors intended to punish Ms. Bertsch for engaging in protected activity.

Ms. Bertsch also maintains that the proffered bases for her termination changed over time.[149]  Ms. Bertsch argues that no one could identify the attachment to her termination notice, that the attachment contained additional reasons for her termination, and that these additional reasons were absent from Overstock's submission to the Department of Workforce Services.[150] This argument is unpersuasive for three reasons.  First, although Mr. Popelka could not specifically recall "Exhibit 4A" during his deposition or at trial, he credibly testified that he was aware of these issues prior to Ms. Bertsch's termination and that the contents represented the

---

the employer's actions—simply disbelieving the employer is insufficient.'"  *Piercy v. Maketa*, 480 F.3d 1192, 1201 (10th Cir. 2007) (quoting *Young v. Dillon Companies, Inc*., 468 F.3d 1243, 1250 (10th Cir. 2006)).

[149] *See, e.g.*, Dkt. No. 100, at 43-44.

[150] *Id.* at 43-44; Trial Tr. 488-90.

reasons for the termination.  Second, Overstock's submission to the Department of Workforce Services does not appear to have been prepared by Ms. Simon or Mr. Popelka, so it is unsurprising that it does not contain every detail that was considered during the decision-making process.  Third and most importantly, the central reason for Ms. Bertsch's termination—her failure to improve working in a team—was consistently represented in Ms. Bertsch's annual reviews, her corrective action plan, the termination notice, and subsequent documentation.[151] While changing reasons for adverse employment actions are undoubtedly probative of pretext,[152] Ms. Bertsch has failed to carry her burden of persuading the court that a few minor inconsistencies in documentation demonstrate that Overstock terminated Ms. Bertsch for engaging in protected opposition.

Finally, Ms. Bertsch's comparison of her termination and the subsequent discipline of Mr. Latimer fails to demonstrate pretext because the court does not possess enough information to conclude that Mr. Latimer was similarly situated to Ms. Bertsch.[153]  Under *Kendrick*, a plaintiff may show pretext by presenting evidence that similarly-situated employees received different treatment for violating rules of comparable seriousness.[154]  Unlike in *Kendrick*, however, Ms. Bertsch did not provide the court with information about the circumstance surrounding Mr. Latimer's discipline—relying instead on the fact that these incidents may have involved some

---

[151] *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000) (concluding plaintiff must "proffer evidence that shows each of the employer's justifications are pretextual" or "cast[] substantial doubt on many of the employer's multiple reasons").  Here, Ms. Bertsch neither controverted each of Overstock's justifications nor cast substantial doubt on the majority of the reasons listed in the termination notice or Exhibit 4A.

[152] *See Matthews v. Euronet Worldwide, Inc.*, 271 F. App'x 770, 774 (10th Cir. 2008) ("[T]here is no support for a finding of pretext if the employer does not give inconsistent reasons, but instead merely elaborates on the initial justification for termination.").

[153] Trial Tr. 494-95.

[154] *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).

level of "unwillingness to work in harmony with others."[155]  But Mr. Latimer's disciplinary notices described violations of workplace policy that differed in scope and severity from Ms. Bertsch's conduct.[156]  Accordingly, the mere submission of subsequent termination notices for Mr. Latimer, some of which occurred years later, does not weigh in favor of a finding of pretext.

      For all of these reasons, the court must conclude that Ms. Bertsch failed to demonstrate that the stated reasons for her discharge were pretextual, or that the determinative factor in the decision to terminate her employment was a complaint to Ms. Howard during an investigation in February 2004, or a vague discussion in the hallway with Mr. Popelka many months earlier.[157] Accordingly, Ms. Bertsch cannot prevail on her Title VII retaliation claim.

## IV.    ANALYSIS OUTSIDE OF *MCDONNELL DOUGLAS*

      Although the parties have stipulated to application of the three-factor test, the court will note that the Tenth Circuit has held "the *McDonnell Douglas* burden shifting analysis does not apply beyond the summary judgment stage."[158]  Indeed, albeit in other contexts, the Tenth Circuit observed that after "a full trial on the merits, the sequential analytical model . . . drops out and we are left with the single overarching issue whether plaintiff adduced sufficient evidence to

---

[155] *See, e.g.*, Dkt. No. 100, at 44.

[156] *See, e.g.*, *Kendrick*, 220 F.3d at 1233-34.

[157] Ms. Bertsch briefly argued that pretext (and therefore liability) may be based on a finding of improper motive. Dkt. No. 103, at 7-8.  This line of reasoning appears to be foreclosed by *University of Texas Southwest Medical Ctr. v. Nassar*, in which the Supreme Court held that a plaintiff must demonstrate "but-for" causation for retaliation claims.  133 S. Ct. 2517, 2533 (2013); *see also Barrett v. Salt Lake Cnty.*, 754 F.3d 864, 868 (10th Cir. 2014) (rejecting "mixed motive" standard).  In any event, the court does not need to reach the novel legal theory advocated by Ms. Bertsch, because Ms. Bertsch failed to prove that an improper motive drove Overstock's decision to suggest relocation to the warehouse, issue a corrective action plan, or terminate her employment.

[158] *Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1196 (10th Cir. 2012) (citing *Randle v. Aurora*, 69 F.3d 441, 453 (10th Cir. 1995)).

warrant a jury's determination that adverse employment action was taken" because the plaintiff engaged in protected activity.[159]

Even if this court were to disregard the *McDonnell Douglas* framework, the court cannot conclude on the record before it that a relocation to an existing warehouse office, a corrective action plan enforced against two coworkers who had engaged in a public dispute over their responsibilities, and a decision, months later, to terminate one of these employees after she consistently failed to improve was caused by that employee's discussion of a male coworker's inappropriate conduct with Overstock's Human Resources Director and the employee's supervisor.  Rather, this court must find, based on the evidence before it, that Overstock took lawful, reasonable steps to promote workplace harmony, create an adequate record of the need and scope of corrective action, and eventually terminated Ms. Bertsch after her conduct continued to cause problems in the work environment.  In sum, Ms. Bertsch has failed to prove by a preponderance of the evidence that Overstock retaliated against her because she had complained of Mr. Latimer's inappropriate conduct.[160]

## CONCLUSION

For all of these reasons, the court finds in favor of Overstock.  The court directs the Clerk of Court to enter judgment in its favor and close the case.

SO ORDERED this 24th day of November, 2014.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

---

[159] *Kendrick*, 220 F.3d at (quoting *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 744 (10th Cir. 1991)).

[160] *Davis v. Unified Sch. Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014).